UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Anthony Boschele and Nancy Boschele, | ) | |
| | ) | Civil Action No. 4:13-cv-01419-BHH-KDW |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| David G. Rainwater, Chesterfield County | ) | |
| Sheriff's Office, Sam Parker in his official | ) | |
| capacity as the Sheriff of Chesterfield | ) | |
| County, Chesterfield County, Kip Kiser in | ) | |
| his official capacity as the Sheriff of | ) | |
| Chesterfield County and Robert Lee in his | ) | |
| official capacity as the Sheriff of | ) | |
| Chesterfield County, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiffs filed this 42 U.S.C. § 1983 action alleging that Defendant Rainwater violated their Fourth and Fourteenth Amendment rights during the course of their arrest and subsequent imprisonment. Plaintiffs also brought South Carolina state law claims against the remaining Defendants. This matter is before the court on Defendants' Motion for Summary Judgment, ECF No. 42, filed on March 6, 2015. On April 10, 2015, Plaintiffs filed a Memorandum in Response and Opposition to Defendants' Motion, ECF No. 55. Defendants filed a Reply on April 23, 2015, ECF No. 59, and Plaintiffs filed a Sur-Reply on May 11, 2015, ECF No. 68. Therefore, this matter is now ripe for review. This case was referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(f), D.S.C. Because this Motion is dispositive, a Report and Recommendation is entered for the court's review.

I.    Background

Anthony Boschele ("Husband") and Nancy Boschele ("Wife"), together ("Plaintiffs") brought this lawsuit after Defendant Rainwater arrested them on May 20, 2011. Compl. ¶ 1, 7, ECF No. 1. Plaintiffs allege that on the day of the arrest they "were peacefully in their home watching television around 5:00 p.m. located at 323 Black Angus Lane in Cheraw, South Carolina." *Id.* at ¶ 7. They maintain that Defendant Rainwater approached their driveway and property around 5:00 p.m. because he was "allegedly investigating a call about someone having words with a deliveryman at another house on Black Angus Lane." *Id.* at ¶¶ 8-9.

Plaintiffs allege that Defendant Rainwater detached a cable that blocked the entrance of their driveway from the road and drove onto their grass and up to their front door. *Id.* at ¶ 10. After Defendant knocked on the door, Plaintiffs represent that Husband answered it shortly thereafter admittedly with a machete in hand because Husband did not know why someone was at the front door. *Id.* at ¶ 11. Plaintiffs maintain that Husband did not make any verbal or physical threats to Defendant Rainwater but asked him if he had a search warrant. *Id.* at ¶¶ 13-14. Plaintiffs maintain that Defendant Rainwater identified himself as law enforcement and yelled to Husband that "if he didn't drop the weapon he was going to get shot." *Id.* at ¶ 14. Upon instruction, Plaintiffs allege that Husband complied as instructed and laid the machete inside the house. *Id.* at ¶ 15. Thereafter, Plaintiffs maintain that without warning Defendant Rainwater then "physically attacked [Husband], drug him outside the house and threw him off the porch ledge that was approximately 3 to 4 feet high off the ground." *Id.* at ¶ 16. Plaintiffs allege that Husband is elderly and disabled and Defendant Rainwater easily overpowered and handcuffed him. *Id.* at ¶ 17.

While Defendant Rainwater was handcuffing Husband, Plaintiffs allege that Wife came onto the front porch and told Defendant Rainwater that Husband "was a disabled veteran." *Id.* at

¶ 18. Plaintiffs allege that Defendant Rainwater then instructed Wife to "step back inside and mind her own business or she would join him in jail." *Id.* at ¶ 19. Plaintiffs maintain that in response Wife told Defendant Rainwater she was going to file a complaint and attempted to walk back into the house when Defendant Rainwater attacked her without warning and "threw [Wife] off the porch on to the concrete landing causing her to be severely injured including compound fractures to her legs and other parts of her body." *Id.* at ¶¶ 20-21. Plaintiffs allege that "during [Defendant Rainwater's] attack on [Wife] and while still handcuffed [Husband] came and attempted [to] aid [Wife] when Defendant Rainwater attacked [Husband] again causing him to be severely injured." *Id.* at ¶ 22.

Plaintiffs allege that Wife suffered a compound fracture to her right leg and a broken neck at the C-3 level, and Husband suffered seven broken ribs, a punctured lung, and a dislocated shoulder. *Id.* at ¶ 23. Plaintiffs represent they were transported to the local hospital for treatment and "incurred a lengthy stay in the hospital, incurred enormous medical bills, will incur future medical care and bills, have suffered permanent physical injury and impairment as well as suffered mental and emotional harm." *Id.* at ¶ 23. Plaintiffs bring suit against Defendant Rainwater individually under § 1983 for false arrest under the Fourth Amendment to the Constitution for improper seizure, excessive force, and false arrest under the Fourth and Fourteenth Amendments to the Constitution. *Id.* at ¶¶ 24-29; 36-41. Additionally, Plaintiffs bring a § 1983 claim under the First Amendment to the Constitution for false arrest because they claim that the exercise of their First Amendment rights was a motivating factor in their arrest. *Id.* at ¶¶ 48-49. Plaintiffs also bring suit against the Chesterfield County Defendants for common law false imprisonment, battery, and false arrest under the South Carolina Tort Claims Act. *Id.* at ¶¶

30-35; 42-47. Plaintiffs seek compensatory and punitive damages, attorney's fees and costs. ECF No. 1-1 at 14.

## II.    Standard of Review

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 251. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989).

## III.    Analysis

Initially, Defendants maintain that the only proper parties to this action are David G. Rainwater, in his individual capacity, and the Sheriff of Chesterfield County. ECF No. 42-1.

Plaintiffs agree and represent that "Sam Parker in his official capacity as the Sheriff of Chesterfield County; Chesterfield County; Kip Kiser in his official capacity as Sheriff of Chesterfield County; and Robert Lee in his official capacity as the Sheriff of Chesterfield should be dismissed from this case." ECF No. 55 at 15. Therefore, with the joint consent of these parties, the undersigned recommends that all Defendants except David G. Rainwater, in his individual capacity, and the Sheriff of Chesterfield County be dismissed as parties to this action.

The undersigned will begin the merits section by addressing Plaintiffs' § 1983 causes of action for unlawful seizure, excessive force, and false arrest. Thereafter, the undersigned will address Plaintiffs' common law causes of action.

A.     Husband's Fourth Amendment Seizure and Arrest Violation Allegations[1]

Defendants assert that Defendant Rainwater did not violate the Fourth Amendment. ECF No. 42-1 at 9. Defendants maintain there are four phases of the encounter between Defendant Rainwater and Plaintiffs and "[a]t each phase of the encounter [Defendant] Rainwater's actions were reasonable because they either did not implicate the Fourth Amendment or because they were limited in scope to the legitimate law enforcement purpose that made them necessary to begin with." *Id.* at 10. Defendants argue that Defendant Rainwater's actions in seizing Husband

---

[1] Initially, Defendants argue that Defendant Rainwater's initial entry onto Plaintiffs' property did not implicate the Fourth Amendment based on the "knock and talk" rule and the "open fields" doctrine. ECF No. 42-1 at 10. Alternatively, Defendants argue that even if the Fourth Amendment was implicated, Defendant Rainwater had reasonable suspicion and probable cause to enter the property based on the facts of this case, and his actions were reasonable. *Id.* Plaintiffs argue that Defendant Rainwater lacked probable cause to enter their property and the knock and talk rule was inapplicable because the implied license to knock had been revoked. ECF No. 55 at 17. In Reply, Defendants do not address Plaintiffs' implied license argument. It is unnecessary to address Defendants' "knock and talk" or "open fields" arguments based on the undersigned's finding that Defendant Rainwater had probable cause to believe Husband had committed a crime, and therefore had the right to enter Plaintiffs' property.

were reasonable because Defendant Rainwater had both reasonable suspicion and probable cause to believe a crime had been committed based on the facts of this case. *Id.* at 14-15.

Plaintiffs argue that Defendants' Motion should be denied because Defendant Rainwater did not have probable cause to enter upon Plaintiffs' property because "he was investigating an alleged misdemeanor, which requires a crime to be freshly committed to attain probable cause." ECF No. 55 at 17; 21. Specifically, Plaintiffs maintain that whether a crime was "freshly committed" remains a material fact in dispute. *Id.* Defendants maintain that Defendant Rainwater was dispatched to the area and had sufficient information to believe that a crime had been freshly committed. ECF No. 42-1 at 16. Specifically, Defendant Rainwater received a call from dispatch indicating a dispute occurred between Husband and a delivery driver, and Husband threatened the driver. ECF No. 59 at 5.

Whether a crime was "freshly committed" is not part of the analysis for a § 1983 Fourth Amendment violation. The undersigned will address the "freshly committed" argument—a requirement which stems from a South Carolina code section and not federal law—in the section addressing South Carolina common law causes of action. At issue here is whether Defendant Rainwater had probable cause to believe a crime had been committed prior to his entry upon Plaintiffs' property.

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004). Probable cause exists if the "facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person . . . in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979). "The validity of the

arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Id.* at 36. "In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest." *Taylor v. Waters,* 81 F.3d 429, 434 (4th Cir. 1996). "Probable cause requires more than 'bare suspicion' but requires less than evidence necessary to convict." *Porterfield v. Lott,* 156 F.3d 563, 569 (4th Cir. 1998) (internal citations omitted). Reasonable law officers need not "resolve every doubt about a suspect's guilt before probable cause is established." *Torchinsky v. Siwinsky,* 942 F.2d 257, 264 (4th Cir. 1991). Probable cause will be found when "the facts and circumstances within an officer's knowledge— or of which he possesses reasonably trustworthy information—are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed." *Wadkins v. Arnold,* 214 F.3d 535, 539 (4th Cir. 2000). "'Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Rogers v. Pendleton,* 249 F.3d 279, 290 (4th Cir. 2001) (quoting *Pritchett v. Alford,* 973 F.2d 307, 314 (4th Cir. 1992)). "Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." *Id.* A court's inquiry should be made based on the information possessed by the officer at the time of the arrest that was then reasonably available to him at the time of arrest, and "in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions." *Pritchett,* 973 F.2d at 312. When a plaintiff alleges a lack of probable cause for an arrest, he "must allege a set of facts which made

it unjustifiable for a reasonable officer to conclude" that the plaintiff was involved in the charged offense. *Brown v. Gilmore,* 278 F.3d 362, 368 (4th Cir. 2002).

Since filing this action the parties have engaged in discovery, and Plaintiffs attached several key pieces of discovery to their Response to Defendants' Motion for Summary Judgment, including an affidavit by the delivery driver. In his affidavit, William Howell attests that he works as a truck driver for Averitt Trucking Company and was making a delivery to a home on Black Angus Road on May 20, 2011. Howell Affidavit, ECF No. 55-4 at ¶¶ 1-3. After Howell completed his delivery he represents:

> A man pulled up in a car, and became extremely aggressive and rude towards [him], without [him] doing or saying anything. This man immediately started using profanity and making threats, saying he would kick [his] ass. [Howell] was so shocked at this unprovoked attack, [he] did not say anything in response. The man then got out of his car and started making rude, obscene gestures, and trying to get [Howell] to fight him. He was acting out of control, and appeared ready to fight. [Howell] immediately retreated away from where he was standing, as [Howell] did not want to get into a fight.

*Id.* at ¶¶ 4-5. Howell avers that the man told him "this shit is going to stop, [he] better not f--king pull onto his property, and to stay the hell off of his property," and that the man told Howell he would "mess [him] up if [he] came on his property." *Id.* at ¶ 6. During his exclamations to Howell, Howell attests that the man was "hitting himself in the crotch and gyrating with his crotch." *Id.* at ¶ 7. Howell maintains that he was shocked and scared by the man's actions "as he seemed very serious about fighting [Howell]." *Id.*

Additionally Howell avers that "[a] young man standing in the yard where [he] was making the delivery advised [him] that the man was crazy, and [he] needed to be careful, because he was so unpredictable." *Id.* at ¶ 8. According to his affidavit, Howell attests that the young man "also advised [him] that while [Howell] was trying to get away from the man, [the young man] had seen the man get a gun from his car." *Id.* Though Howell represents that he never saw the

gun, he "believed the young man when he said he had seen one." *Id.* Howell maintains he called 911 and "was very scared and concerned about what [the man] might do." *Id.* at ¶ 9. Howell attests that a Deputy arrived shortly after he called 911, and Howell told the Deputy "everything listed in this affidavit, and also told him to be careful due to the man's irrational and aggressive behavior." *Id.* at ¶ 10. Howell maintains that "[t]he Deputy, who introduced himself as Deputy Rainwater, was extremely professional, and advised [Howell] that he would go try to find the man and speak to him, to further investigate." Howell avers that he left after Deputy Rainwater arrived and advised him that he could leave and continue with his deliveries. *Id.* at ¶ 11.

In addition to Howell's affidavit, the parties have attached several deposition transcripts to their filings, including the transcript of Defendant Rainwater's deposition. During Defendant Rainwater's deposition he testified that on May 20, 2011, he received a call from Chesterfield County dispatch by radio, and the dispatcher told him that "a delivery driver wanted to speak with [him] about being threatened." Rainwater Dep. 5-7, ECF No. 55-5. Dispatch gave Defendant Rainwater an address on Black Angus Lane, and Defendant Rainwater testified that he "immediately" went to the address though he does not recall how long it took him to get there. *Id.* at 8-10. Defendant Rainwater testified regarding the statement made in his incident report. *Id.* at 10-15. When asked whether a crime had been committed, Defendant Rainwater agreed that common law assault was committed as well as violation of the "Communicating Threats Statute" based on Husband's verbal threats. *Id.* at 15-16. Defendant Rainwater testified that he was only investigating a misdemeanor at this point. *Id.* at 16. Prior to speaking with Husband, Defendant Rainwater testified that he had no intention of arresting Husband. *Id.* at 17. However, Defendant Rainwater testified that he believed he had probable cause to arrest Husband for a common-law misdemeanor. *Id.* at 18.

Defendant Rainwater's Incident Report was an Exhibit to his deposition. *Id.* at 4-5. In his Report, Defendant Rainwater indicated that he was the "Responding Officer" or "RO." ECF No. 55-6. According to his Report, Defendant Rainwater states, verbatim:

> R/O received a call from dispatch in reference to a truck driver wanting to speak with an officer in reference to a male subject threatening him while he was making a delivery. The delivery driver stated to R/O that he was parked at the end of Black Angus Lane in Cheraw unloading his truck when a Mr. Boschele came up to his vehicle & got out yelling and cursing at him stating that "this shit was gonna stop today, he was not gonna have anyone else trespass on his driveway again." The truck driver, William Howell of Averitt Trucking, states that someone needs to come talk to this gentleman because he was afraid of him & he had threatened him & saying he would kick his ass. R/O responded to Black Angus and met with Mr. Howell, who again told me his story & also stated that there was a teenage male who had witnessed this incident while he was unloading his truck. Mr. Howell states that the teenager told him that Mr. Boschele had gotten a gun from his vehicle but Mr Howell states that he never saw a weapon. Mr Howell advised me that he had finished unloading his delivery so I advised him he could leave the scene & I was going to speak with Mr Boschele. I proceeded to the end of Black Angus Ln & met a cable where Mr Boschele's property began with a private property sign hanging on it. I blew my horn 2 times & never saw any movement from towards Mr Boschele's residence so I layed down the cable & drove up the driveway. As I exited my patrol vehicle Mr Boschele came from his residence & I could see a long machete in his hand as he began to yell "Wheres your f--king warrant? This is private property." I placed my hand on my service weapon as I stopped & advised Mr Boschele that if he didn't drop the weapon he was going to get shot. He began to tell me that he was ex-marine & had done time in Vietnam & that this was private property & I had better leave. I advised him that I was there to ask about the incident with the truck driver & he again yell about me being on private property & turned to go back towards his house.

ECF No. 55-6 at 1-3.

Here, Defendant Rainwater responded to a 911 call and upon arrival at the scene of the dispute, he spoke directly to William Howell, the individual who placed the call. Based on Howell's report to him, Defendant Rainwater believed that the man living at Plaintiffs' residence had committed common law assault or violated other state law. These undisputed facts alone gave Defendant Rainwater the necessary probable cause to enter upon Plaintiffs' property and arrest Husband. *See*, *e.g.*, *Torchinsky*, 942 F.2d at 262-65 (holding probable cause existed when

police officer interviewed victim of assault, and victim identified assailant to officer); *McKinney v. Richland Cty. Sheriff's Dep't*, 431 F.3d 415, 418-19 (4th Cir. 2005) (holding the district court erred in finding probable cause did not exist, and determining that "[t]he fact that [officer] did not conduct a more thorough investigation before seeking the arrest warrant does not negate the probable cause established by the victim's identification"); *United States v. Beckham*, 325 F. Supp. 2d 678, 687 (E.D. Va. 2004) (internal citation omitted) ("Particularly relevant here is the principle that a finding of probable cause may be based on information provided by a victim or eyewitness to a crime, as 'it is well-established that [w]hen an officer has received. . .information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause.'"). Accordingly, the undersigned recommends granting Defendants' Motion for Summary Judgment and dismissing Plaintiffs' cause of action for a Fourth Amendment violation based on Defendant Rainwater's probable cause for seizure and arrest of Husband.

B.     Wife's Fourth Amendment Seizure and Arrest Violation Allegations

Defendants maintain that Defendant Rainwater had adequate justification to seize Wife. ECF No. 42-1 at 20. They argue that Wife's actions "made it permissible for Rainwater to briefly detain her so that he could conclude his arrest of [Husband because] an officer is entitled to take reasonable steps to maintain the status quo and ensure his safety during an investigation." *Id.* Additionally, Defendants contend that "a reasonable officer could have concluded, as did Rainwater, that [Wife's] actions provided probable cause to arrest for hindering a law enforcement officer." *Id.* Plaintiffs maintain that there are material issues of genuine fact as to whether the seizing of Wife was warranted. ECF No. 55 at 28. Additionally, Plaintiffs argue that

"[t]here is a legitimate question of whether a reasonable person would believe that [Wife] was threatening to Deputy Rainwater." *Id.* at 29.

At issue here is whether Defendant Rainwater either (1) was authorized to detain Wife in order to complete Husband's arrest or (2) had probable cause to believe Wife committed a crime, warranting her arrest. Numerous courts have held that an officer may detain a person, including by using handcuffs, in order to maintain officer safety during an investigation, especially when the threat of a weapon is present. *See, e.g.*, *United States v. Hensley*, 469 U.S. 221, 235 (1985) ("When the . . . officers stopped Hensley, they were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."); *Taft v. Vines*, 70 F.3d 304, 320 (4th Cir. 1995) (Motz, J., dissenting) (internal citation omitted) ("It is well established that investigating officers may take such steps as are reasonably necessary to maintain the status quo and to protect their safety during an investigative stop."), *adopted by majority on rehearing en banc*, 83 F.3d 681, 684 (4th Cir. 1996).

Though the facts surrounding Plaintiffs' case do not involve the usual investigative stop, like stopping an individual car or person on foot during a police pursuit, the undersigned finds that the purpose of Defendant Rainwater's entry onto Plaintiffs' property was to investigate an earlier assault that had taken place. Therefore, the undersigned finds that the law permits Defendant Rainwater to take reasonable steps to secure his personal safety during the course of his investigation.

However, based on the conflicting set of facts in this case, the undersigned finds that there is a genuine issue of fact as to whether some of Defendant Rainwater's actions were reasonable under the circumstances. Though Defendant Rainwater presents evidence, via his

Incident Report and deposition testimony, that Wife was interfering with his arrest of Husband,

Plaintiffs' evidence paints a different picture. In his Report, Defendant Rainwater indicates:

> As I got both hands behind his back & handcuffed him his wife stepped outside & began yelling at me saying that I couldn't take him to jail because he was a veteran & had medical problems. I advised her to step back inside & mind her own business or she would join him in going to jail. She advised me in a very loud voice that I was on their property without a warrant & she would file a lawsuit on me & the Sheriffs Dept. At this time I advised her that she was also under arrest & going to jail & grabbed her by her wrists & she turned to run back into the house. I attempted to detain Mrs. Boschele & keep her outside because I wasn't sure if she was after that machete or some other type of weapon. At this time I was in fear for my life not knowing about the weapons. As she did Mr. Boschele ran into my back trying to knock me off balance & kneed me 2 or 3 times in my back while handcuffed. At this point I had pulled Mrs Boschele back outside & she charged at me trying to swing at me. I stepped back with my hand still on her wrist & backed Mr. Boschele off of the porch onto the concrete. . . .

ECF No. 55-6 at 3.

In Defendant Rainwater's deposition he testified that after he put Husband in handcuffs "he was still twisting and turning and trying to get away from [Defendant Rainwater]." Rainwater Dep. 45, ECF No. 55-5. Defendant Rainwater testified that once Wife came out, she was hindering his arrest of Husband because he was "trying to detain [Husband], calm him down, he's yelling at [Defendant Rainwater], and then [Wife] comes out the door yelling, cussing and carrying on." *Id.* at 48-49. Additionally, Defendant Rainwater testified that he had "intentions of charging her with--hindering [him] while [he] was trying to detain [Husband]." *Id.* at 50. Though Defendant Rainwater agreed that Wife was complying with his instruction that she return inside the home, he testified that "[w]hen [he] told her--it was more than once--to go back inside and stop interfering, she wouldn't. And then when she did open up the door, the first thing [he] thought about was that machete laying there." *Id.* at 51. Additionally, Defendant Rainwater testified that Wife "come out screaming and - - you know, her attitude was just like his, so [Defendant Rainwater] felt like she was - - [he] felt just as much threatened by her as [he] did by

[Husband], because of her attitude- - was the same as his." *Id.* at 53. Defendant Rainwater further testified that Wife took a swing at his head with her fist. *Id.* at 55-56.

According to Husband's deposition testimony, Husband did not see Wife try to strike Defendant Rainwater but admitted that "[s]he was mouthing off . . . at him" by saying that Husband was a disabled veteran and was on medications. ECF No. 55-1 at 92. Later, Husband testified that Wife "[came] out [of the house] and was beside him going off at the mouth." *Id.* at 101. Husband testified that Wife was standing about two feet away from Defendant Rainwater. *Id.*

In her deposition, Wife testified that she was sitting in the family room when her Husband opened the door and then saw Defendant Rainwater outside in his uniform. ECF No. 55-2 at 40. Wife testified that after her Husband fell from the porch, she "opened the storm door and stepped out and asked [Defendant Rainwater] what was he doing." *Id.* at 46. In response, Wife testified that Defendant Rainwater told her "to shut up, go back inside, and mind my own God damn f--king business." *Id.* She testified that she did not use any profanity towards Defendant Rainwater but asked, "What are you doing?" and told him "You're on my property. I have the right to know." *Id.* Wife also testified that she told him her Husband was a disabled veteran. *Id.* at 48-49. In response Wife testified that Defendant Rainwater told her to shut up and "'[g]o back inside or [he]'s going to arrest [her].'" *Id.* at 46. Wife testified that she complied with Defendant Rainwater's instruction that she return inside but told him that she was going to report him and what he did. *Id.* at 47. Wife also testified that Defendant Rainwater must have changed his mind because he "pulled [her] out of the house." *Id.* Wife testified that Defendant Rainwater did not tell her why he was there and she never knew why he was on their property. *Id.* Additionally, Wife testified that she never asked Defendant Rainwater about a warrant or said

anything about a warrant. *Id.* at 49. Wife also testified that Defendant Rainwater never told her that she was under arrest. *Id.*

The undersigned finds that several undisputed facts made it reasonable for Defendant Rainwater to attempt to apprehend Wife or secure her until he completed Husband's arrest. First, Husband had admittedly dropped a machete just inside Plaintiffs' front door, and the machete was within Wife's reach when she re-entered the home. The undersigned finds that Defendant Rainwater was authorized to detain Wife in order to protect his personal safety and to maintain the status quo of Husband's arrest. Additionally, Husband admitted that Wife was "mouthing off" or "going off at the mouth" towards Defendant Rainwater. ECF No 55-1 at 92; 101. Furthermore, Wife was in close proximity to Defendant Rainwater throughout the course of their interaction. Husband testified that Wife was standing about two feet away from Defendant Rainwater, and Wife testified that she was "within less than a step of him." ECF No. 55-1 at 101; ECF No. 55-2 at 47.

However, the undersigned is of the opinion that material issues of fact exist on the probable-cause issue. The undersigned has carefully considered the evidence presented by all parties, including the deposition testimony. Having reviewed all evidence, in accordance with applicable standards, the undersigned finds that a question of fact exists as to whether Defendant Rainwater had probable cause to arrest Wife. The undersigned finds that Wife's conduct, in questioning Defendant Rainwater, including "mouthing off," does not conclusively constitute obstruction or hindering of an officer whether under a common law offense of hindering arrest or obstruction of justice. In *State v. Etherage*, 290 S.E.2d 413 (S.C. 1982), the South Carolina Supreme Court held that defendant's actions, including cursing at an officer, calling him names, and threatening to beat him during the course of the arrest of defendant's brother constituted

obstruction or hindrance of an officer. The *Etherage* court found that "an officer can be hindered by language intended to put him in fear, intimidate or impede him in the discharge of his official duties." *Id.* at 414 (citing *State v. Estes*, 117 S.E. 581, 583 (N.C. 1923)). In an earlier case, the South Carolina Supreme Court held that black high-school students who refused to leave a lunch counter at the request of the store manager and police did not violate a city ordinance. *City of Charleston v. Mitchell*, 123 S.E.2d 512 (S.C. 1961) *rev'd on other grounds*, 378 U.S. 551 (1964). There, the ordinance at issue made it unlawful for any person to resist, hinder, or oppose, or interfere with any employee of police department in discharge of official duties. *Id.* at 514. In reversing the convictions, the *Mitchell* court found that:

> [T]he term 'interfere' has been said to import action, not mere inaction, an active rather than a passive condition, and has been defined as meaning to interpose, to prevent some action, sometimes in a bad sense to intermeddle, to check or hamper, and, specifically to do something which hinders or prevents or tends to prevent the performance of legal duty. In its broadest aspects 'interfere' bears the significance of 'disarrange', 'disturb', 'hinder'.

*Id.* at 520-21. Based on this interpretation, the court found that "refusing obedience to the request of the Chief of Police of the City of Charleston was merely inaction on their part and did not constitute interference with said officer in the discharge of his official duty." *Id.* at 521. The *Etherage* and *Mitchell* decisions reference the case of *Estes*, 117 S.E. 581.

In *Estes*, the North Carolina Supreme Court interpreted a hindering statute that made it unlawful to willfully interfere with or obstruct an officer of the state board of health. *Id.* at 581. There, a sanitary inspector went to Estes's store and told him that his toilet did not comply with the law at which point Estes cursed at the officer. *Id.* However, Estes did not "[rise] from his desk and did not strike or offer to strike [the officer]." *Id.* In interpreting the statute the court held that "actual violence or demonstration of force" is not indispensable to such obstruction or interference. *Id.* at 583. Rather, the court determined that "'interfere' is to check or hamper the

action of the officer, or to do something which hinders or prevents or tends to prevent the performance of his legal duty; and to 'obstruct' signifies direct or indirect opposition or resistance to the lawful discharge of his official duty." *Id.* The court found that whether Estes "used language or was guilty of conduct which was calculated and intended to put the officer in fear or to intimidate or impede him as a man of ordinary firmness in the present discharge of his official duties and did thereby hinder or impede him" were "questions of fact for determination by the jury, and not inferences of law for the decision of the court." *Id.*

The above cases do not determine whether there was probable cause to arrest the appellants in those cases. Rather these cases concern interpreting "hinder," "interfere," and "obstruct," when determining whether *convictions* should be affirmed. Here, the undersigned must determine whether Defendant Rainwater had probable cause to arrest Wife. However, in making this determination, the undersigned is guided by the interpretations of terms at issue here. The recent South Carolina District Court case of *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 559 (D.S.C. 2013), provides additional guidance on the probable cause analysis.

There, the district court held that probable cause existed to arrest McCoy for violating a City of Columbia Ordinance based on video evidence of the incident. 929 F. Supp. 2d at 559 ("[P]robable cause existed to arrest McCoy for violation of the Ordinance, the Officer Defendants did not violate McCoy's Fourth Amendment rights."). The Ordinance at issue in the *McCoy* case states that it was unlawful for "any person to interfere with or molest a police officer in the lawful discharge of his duties." *Id.* at 546. There, footage showed that McCoy was "within an arm's reach of officers attempting to secure an arrestee." *Id.* at 558. Furthermore, McCoy "positioned himself in between the officers and their patrol car, where the officers were attempting to move the arrestee." *Id.* Additionally, the video depicted the following:

> The officers pushed McCoy backwards and indicated that he should step away from the arrest scene, but McCoy failed to heed these clear commands. Importantly, the video shows that McCoy's actions forced the officers to divide their attention between securing the arrestee and engaging McCoy. Indeed, because McCoy did not step back from the arrest scene as instructed, two of the officers were eventually required to let go of the arrestee and focus solely on McCoy. The third officer was left to secure the arrestee alone.

*Id.* Therefore, the court concluded that "it was reasonable for the Officer Defendants to believe that McCoy had violated the Ordinance." *Id.* at 558-59.

Unlike in the *McCoy* case, here Wife was never positioned between Husband and Defendant Rainwater. Furthermore, after initially stepping onto the porch, Wife complied with Defendant Rainwater's directive that she return inside Plaintiffs' home. Furthermore, Plaintiffs' version of events greatly differs from what Defendant Rainwater wrote in his Report and testified to in his deposition. Therefore, the undersigned finds that more than one conclusion concerning probable cause can be drawn from the evidence presented to the court.

Though, in some circumstances, South Carolina courts have found that words alone can constitute hindering, the undersigned finds that whether Wife's words amount to hindering is a question of fact. Therefore, the undersigned cannot determine as a matter of law whether Wife's actions were intended to put Defendant Rainwater "in fear or to intimidate or impede him as a man of ordinary firmness in the present discharge of his official duties and did thereby hinder or impede him." Rather, based on the evidence, the undersigned finds that it is a jury question as to whether Wife interfered or hindered Defendant Rainwater's arrest of Husband. *Pritchett*, 973 F.2d at 313 ("If there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial.").

Accordingly, based on the evidence before the court and given the totality of the facts and circumstances within Defendant Rainwater's knowledge at the time of the arrest, the undersigned finds that there is a genuine issue of material fact whether a prudent or reasonable officer would have believed that Wife had committed or was committing a criminal offense. The undersigned recommends the portion of Defendants' Motion that seeks summary judgment for Wife's initial seizure while Defendant Rainwater secured his safety and attempted to maintain the status quo be *granted* and the portion that seeks summary judgment because probable cause existed to arrest Wife for hindering an officer be *denied*.

C.      Plaintiffs' Excessive Force Claims

Defendants assert that Defendant Rainwater did not use excessive force when arresting Plaintiffs. ECF No. 42-1 at 22-25. Specifically, Defendants maintain that officers are entitled to use a reasonable amount of force during the course of an arrest, and whether the force was reasonable must be judged from the perspective of a reasonable officer on the scene. *Id.* at 22. Plaintiffs maintain that "[t]here are genuine issues of material fact as to the amount of force[] used by [Defendant] Rainwater and whether such force was objectively reasonable." ECF No. 55 at 31.  Additionally, Plaintiffs argue that summary judgment should be denied when the disputed facts are taken in the light most favorable to Plaintiffs. *Id.* The undersigned finds that based on the three versions of what transpired between Plaintiffs and Defendant Rainwater, a question of fact remains as to whether Defendant Rainwater used excessive force during the course of Plaintiffs' arrest.

The parties correctly reference *Graham v. Connor*, 490 U.S. 386 (1989), as the test for evaluating the degree of force used during an arrest. There, the Court established that claims against law enforcement for excessive force in course of arrest, investigatory stop or other

"seizure" of a person are properly analyzed under the Fourth Amendment's "reasonableness" standard. *Id.* at 395. There, the Supreme Court recognized "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Further, the Court held that there is not a precise mechanical application of the standard, but "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Additionally, the Court instructs that an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Therefore, guided by the authority in *Graham*, the undersigned must examine the totality of the circumstances and the uncontested facts, viewed in the light most favorable to Plaintiffs, to determine whether Defendant Rainwater's use of force was reasonable.

In his Report, Defendant Rainwater indicates that after Wife charged at him:

> [He] stepped back with [his] hand still on her wrist & backed [Husband] off of the porch onto the concrete hitting his head on it & [Defendant Rainwater and Wife] went off the side of the porch onto the ground. [Wife] immediately began complaining of her leg being broken [and Defendant Rainwater saw Husband] with blood coming from his head from falling on the concrete. [Defendant Rainwater] asked dispatch to send EMS to treat both subjects & both were transported to Chesterfield General for their injuries.

ECF No. 55-6 at 3.

During his deposition, Defendant Rainwater testified that he was holding Wife by her wrist while Husband was positioned directly behind him. ECF No. 55-5 at 56-57. Specifically, Defendant Rainwater testified that he "started backing up to pull [Wife] out of the door, [and] [a]s [he] backed up, [he] knocked [Husband] backwards and he went back down the steps." *Id.* at 57. In other words, Defendant Rainwater testified that he "backed [Husband] off the porch." *Id.* Moreover, Defendant Rainwater testified that it was an accident that Husband fell off the porch, that he did not deliberately push Husband from the porch and did not at any time take Husband and swing him from the porch. *Id.* at 58-59. Additionally, Defendant Rainwater testified that he fell off the porch by accident as well and pulled Wife with him because he "still had ahold of her arm." *Id.* at 60. Defendant Rainwater specifically testified that he did not throw Wife off porch, and they both fell at the same time. *Id.* Defendant Rainwater also testified that he never handcuffed Wife. *Id.* at 62.

Plaintiffs present a different set of facts in their depositions. During his deposition Husband testified that in response to his dog barking he came to his front door holding a machete. ECF No. 55-1 at 78-79. When he opened the door, Husband testified that he found Defendant Rainwater standing on his porch and "his eyes got real big because [Husband] was holding a machete." *Id.* at 79. Husband testified that he then put down the machete and "put [his] hand on the door to go out, and he handcuffed me. . . .[Husband] did not volunteer the other hand; [Defendant Rainwater] pulled [him] out of the house." *Id.* Specifically, Husband testified that he dropped the machete within one minute of opening the door. *Id.* at 82. Husband indicated that his front door has an inside door and an outside "storm" door, and when he unlatched the storm door, Defendant Rainwater "had thrown a cuff on [his] hand, and he was – had dragged [Husband] out of the house." *Id.* at 80-82.

Husband testified that he told Defendant Rainwater that he was trespassing when he first opened the door and told him that it was private property. *Id.* at 83. Additionally, Husband testified that when he opened the door Defendant Rainwater "slapped the handcuff on [his] left hand and started pulling [him] and [he] was saying, 'What are you doing? What are you doing? You're trespassing.'" *Id.* at 85. Later Husband testified that Defendant Rainwater "couldn't catch up to [him]," and he was trying to stay away from him "[t]o get away from causing turmoil in [his] house." *Id.* at 105. Husband agreed in his testimony that Defendant Rainwater was trying to get his other arm, but Husband would not let him and "was trying to get away." *Id.* at 106, 113. Additionally, Husband testified that he told Defendant Rainwater to leave three times, and that "when [he] opened that door and [Defendant Rainwater] put the handcuff on [him], it was on." *Id.* at 111. Husband testified that Defendant Rainwater "was in fear [for] his butt" during the incident. *Id.* at 111-12. Husband testified that there was a cuff only on his left hand when Defendant Rainwater dragged him out of his house. *Id.* at 85. According to his testimony as they were moving, Husband asked "What's the problem? Do you have a warrant?" and Defendant Rainwater did not respond and "just slung [him]." *Id.* Furthermore, Husband testified:  "Then in a few seconds, he'd slung [him] from [his] house around the table. [Husband] smacked the steel potting--pot--a big, steel pot, and [he] tripped up on that. And [Defendant Rainwater] saw that was going on, and he let go of the other handcuff." *Id.* at 86. Husband testified that Defendant Rainwater "just let go of [the other handcuff] and let [him] fall. . . .off the edge of [the] porch, onto the deck" *Id.* Husband agreed that he fell off the porch when he lost his balance after tripping over the flower pot, and Defendant Rainwater let go of the other handcuff. *Id.* at 94-95.

After the fall, Husband testified that Defendant Rainwater "came down the steps and kicked [him] in the side and rolled [him] over and slapped the other handcuff on and stood him

up--backed [him] up against the porch." *Id.* at 87. Husband testified that his wife came out onto the porch after he fell and does not recall his wife coming out on the porch before he fell. *Id.* at 86-87. Husband testified that while sitting on the ground, before he was handcuffed "[he] turned and looked and [Defendant] Rainwater had his leg up kicking [his] wife with one stroke." *Id.* at 88. Husband testified that when he saw what happened he "tried to crawl back up to see if [he] could get over to assist her. And [Defendant Rainwater] came down the steps and kicked [him] and rolled [him] over and handcuffed [his] other hand." *Id.* at 90. Specifically, Husband testified that he saw Defendant Rainwater's "leg come up and shoot straight out and [his] wife go flying. . .[he] just saw her laying in the yard. . ." *Id.* According to his testimony, Wife went off the side of the porch and Defendant Rainwater did not. *Id.* at 90, 103. Husband testified that he did not see Wife try to strike Defendant Rainwater but admitted that "[s]he was mouthing off. . .at him" by saying that Husband was a disabled veteran and was on medications. *Id.* at 92. Later, Husband testified that Wife "[came] out [of the house] and was beside [Defendant Rainwater] going off at the mouth." *Id.* at 101. Husband testified that Wife was standing about two feet away from Defendant Rainwater. *Id.*

Turning to Wife's deposition, Wife testified that Defendant Rainwater "was slinging [Husband] around. And he had hit the table, and then next thing [she] kn[ew], that -- he got right there at the flower pot, and [Defendant] Rainwater let go of the handcuff, and then he pushed him." ECF No. 55-2 at 42. Specifically, Wife testified that she heard a bunch of noise, got up, and saw Defendant Rainwater slinging her Husband then he "got to the edge of the porch, and he was there, and [Defendant] Rainwater let go of the handcuff and gave him a push with the other hand. " *Id.* at 43.

Wife also testified that Defendant Rainwater grabbed her "by [her] hair or [her] arms because there - - [there were] bruises on [her] arms." *Id.* at 50. Next, Wife testified that she saw Husband "was going to come up the steps, and [Defendant] Rainwater turned around and looked and saw him coming up the steps, so he took his foot and pushed him back off the steps. And the next thing [she knew], when [she] came to, [she] was laying out in the yard." *Id.* Additionally, Wife testified that Defendant Rainwater "could've kicked [her] because [her] femur bone and knee and everything was crushed and [she] had to have a plate put in it." *Id.* at 51. Later, Wife testified that she got off the porch because Defendant Rainwater kicked her, and she knows he kicked her "[b]ecause [of how] far as [she] landed." *Id.* at 51-52. Then, Wife testified that she was "pretty sure he kicked [her]." *Id.* at 52. Wife testified that Defendant Rainwater "pushed [Husband] off and the next thing [she knew she] went flying off." *Id.* at 53. Further, Wife testified that "there's no way [Defendant] Rainwater could've fell off the porch [and] he did not fall off that porch with [her]." *Id.* at 57-58. She based this on the fact that Defendant Rainwater's uniform was not dirty and because she was "so far out in the yard." *Id.* at 58. Wife testified that she was either thrown or kicked off the porch. *Id.* at 58. Wife testified that she never tried to hit or punch Defendant Rainwater. *Id.* at 55.

### 1.  Husband's Claim

The force used by an officer is not excessive if the officer's "actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham v. Connor,* 490 U.S. at 397; *Schultz v. Braga*, 455 F.3d 470, 477 (4th Cir. 2006). "To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances." *Gandy v. Robey*, 520 F. App'x 134, 140 (4th Cir. 2013) (citing *Rowland v.*

*Perry*, 41 F.3d 167, 172 (4th Cir. 1994)). The United States Supreme Court, the Fourth Circuit and other circuits have consistently held that officers may use a reasonable amount of force to secure a suspect. *See e.g.*, *Scott v. Harris,* 550 U.S. 372 (2007); *Graham,* 490 U.S. 386; *Thomas v. Holly*, 533 F. App'x 208, 215 (4th Cir. 2013) *cert. denied*, 134 S. Ct. 939 (2014). *Graham* instructs that in analyzing the amount of force used, the court should consider three factors:  (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396. In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed. *Elliott v. Leavitt,* 99 F.3d 640, 643 (4th Cir. 1996).

In considering the *Graham* factors during Husband's arrest, the undersigned finds that all weigh in favor of Defendant Rainwater. Here, Husband committed what Defendant Rainwater believed was an assault, which is misdemeanor. However, Husband also held a machete even though Defendant Rainwater was a police officer and dressed in uniform, posing a threat to the officer. Husband and Wife concede that Husband initially held a machete when Defendant Rainwater approached their porch. Though Husband ultimately dropped the machete, he initially carried it, and it was in close range of Defendant Rainwater, and Husband acknowledged Defendant Rainwater's fear when he saw the weapon. *See* ECF No. 55-1 at 79. Therefore, the first two *Graham* factors weigh in favor of Defendant Rainwater. Finally, Husband admits that he was evading arrest. Specifically, the following colloquy occurred during Husband's deposition:

> Q:     Okay – when you were still on the porch, was – was Rainwater trying to put the other handcuff on you?
> A:     He couldn't catch up to me.
> Q:     Okay. When you say he "couldn't catch up" to you, what do you mean?

    A:     We were rounding the table.
    Q:     You were just, basically, trying to stay away from him?
    A:     To get away from causing turmoil in my house.

*Id.* at 105. Later Husband testifies that he was "trying to get away." *Id.* at 113. Therefore, the final *Graham* factor weighs in favor of Defendant Rainwater as Husband was admittedly trying to evade arrest or dodge Defendant Rainwater's attempts to place his other hand in a handcuff. Up until the point where Husband falls from the porch, the undersigned recommends finding that Defendant Rainwater used an objectively reasonable amount of force in attempting to apprehend Husband.

    However, at least once Husband testifies that Defendant Rainwater pushed him from the porch. The undersigned notes that Husband's testimony is inconsistent because Husband testifies that he fell from porch when Defendant Rainwater let go of the handcuffs and in another instance he testified that Defendant Rainwater "threw [him] off the porch." *Id.* at 89. In another section, Husband testifies that Defendant Rainwater "saw that [he] was off-balance. And [he] hit the steel flower pot, and [Husband's] legs [gave] out. And [Defendant Rainwater] came around and saw that [Husband] was just laying there, and he pushed [Husband] off onto the deck down below." *Id.* at 94. In yet another section of his testimony, Husband represents that he is "not sure if [Defendant Rainwater] let go of [the handcuff] or if he just nudged [him]--let go of it and nudged [him]." *Id.* at 106-07. Wife corroborates Husband's version of the story that indicates Defendant Rainwater pushed him from the porch. *See* ECF Nos. 55-2 at 42 ("[Defendant] Rainwater let go of the handcuff, and then he pushed him."); *Id.* at 43 ("[Defendant] Rainwater let go of the handcuff and gave him a push with the other hand.").

    In addition to alleging that Defendant Rainwater pushed him from the porch, Husband alleges that Defendant Rainwater kicked him in order to place his other hand in handcuffs or

"rolled [him] over with his foot and clapped the other handcuff on [him]." *Id.* at 91. Later, Husband testifies that Defendant Rainwater "came back over [to him] and kicked [him] over and handcuffed [him]." *Id.* at 103; 105. In another section of his deposition, Husband alleges that after the fall, Defendant Rainwater "came down the steps and kicked [him] in the side and rolled [him] over and slapped the other handcuff on and stood him up--backed [him] up against the porch." *Id.*

In viewing the facts in the light most favorable to Plaintiffs, based on Plaintiffs' testimony in their depositions, the undersigned cannot find as a matter of law that Defendant Rainwater used an objectively reasonable amount of force throughout the *entire* apprehension of Husband. Therefore, the undersigned recommends the portion of Defendants' Motion that seeks summary judgment for Defendant Rainwaters' actions until Husband fell or was pushed from porch be *granted* and the portion that seeks summary judgment for Defendant Rainwater's actions during and after Husband's fall or push from porch be *denied*.

### 2. Wife's excessive force claim

Turning to the amount of force used during Defendant Rainwater's attempted apprehension of Wife, the undersigned finds the *Graham* factors weigh in Wife's favor. First, whether Wife committed a crime remains a question of fact. As discussed in section III-B, *see supra*, the undersigned finds that whether Defendant Rainwater had probable cause to arrest Wife for hindering Husband's arrest is a question of fact. Additionally, in considering the second *Graham* factor, whether Wife posed an immediate threat to the safety of the officers or others, also remains a question of fact. Finally, the third *Graham* factor weighs in favor of Wife. Even under Defendant Rainwater's version of the facts, Wife was compliant with Defendant

Rainwater's instructions and was not actively resisting arrest or attempting to evade arrest by flight.

Moreover, Plaintiffs allege that Defendant Rainwater kicked Wife from the porch. Wife cannot precisely recall that Defendant Rainwater kicked her, but she presumes that based on where she landed that must have been what occurred. ECF No. 55-2 at 51-52. However, Husband's testimony corroborates Wife's version of events because he testifies that once he was on the ground, "[he] turned and looked and [Defendant] Rainwater had his leg up kicking [his] wife with one stroke." *Id.* at 88. Additionally, Husband testifies that he saw Defendant Rainwater's "leg come up and shoot straight out and [his] wife go flying. . .[he] just saw her laying in the yard. . ." *Id.*

In viewing the facts in the light most favorable to Plaintiffs, based on Plaintiffs' testimony in their depositions, the undersigned cannot find as a matter of law that Defendant Rainwater used an objectively reasonable amount of force during his attempted apprehension of Wife. Therefore, the undersigned recommends denying Defendants' Motion for Summary Judgment on Plaintiffs' use of excessive force against Wife cause of action based on genuine issues of material fact.

D.      First Amendment Violations

Defendants argue that Defendant Rainwater did not violate Plaintiffs' First Amendment rights. ECF No. 42-1 at 25-27. Furthermore, Defendants maintain that "the validity of an arrest turns on the existence of probable cause and not on the officer's subjective motivations." *Id.* at 27.  Plaintiffs argue that summary judgment must be denied on the 42 U.S.C. § 1983 claim for violation of Plaintiffs' First Amendment right to voice opposition to an unlawful arrest. ECF No. 55 at 39. Plaintiffs maintain that Husband had a right to question Defendant Rainwater about his

presence on their property, and Wife had a right to question Defendant Rainwater about his presence and what was happening to Husband. *Id.* at 41.

The undersigned finds that Husband's cause of action for a § 1983 First Amendment violation fails based on the finding that probable cause existed to arrest Husband. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that probable cause is the only limit the Fourth Amendment to the U.S. Constitution imposes on a police officer's decision to arrest). The *McCoy* case, *see supra*, analyzed the plaintiff's First Amendment cause of action for retaliatory arrest.[2] 929 F. Supp. 2d at 559. Even though the court found that officers had probable cause to arrest McCoy, the court held that probable cause "may not foreclose the possibility of a First Amendment violation." *Id.* There, the court cited the Supreme Court case of *Reichle v. Howards*, 132 S.Ct. 2088 (2012), which held "that, as of the time of the plaintiff's arrest, it was not clearly established that an arrest supported by probable cause could violate the First Amendment." *Id.* Accordingly, the *Reichle* court reversed the Tenth Circuit's ruling that Secret Service agents were not entitled to qualified immunity. *Id.* at 559-60. In its analysis of qualified immunity the Supreme Court explained that the "right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause," and the "Court has never held that there is such a right." *Id.* at 560 (citing 132 S.Ct. at 2094). Based on several decisions, the district court held that the

---

[2] The district court found the Supreme Court case of *Hartman v. Moore*, 547 U.S. 250 (2006), "held that a plaintiff cannot state a claim of retaliatory *prosecution* in violation of the First Amendment if the charges were supported by probable cause. Although *Hartman* did not decide whether its no-probable-cause requirement extends to retaliatory *arrests*, several federal courts of appeal have subsequently held that it does." 929 F.Supp. 2d at 559 (emphasis in original) (citing *McCabe v. Parker*, 608 F.3d 1068, 1075 (8th Cir. 2010); *Phillips v. Irvin*, 222 F.App'x. 928, 929 (11th Cir. 2007); *Barnes v. Wright*, 449 F.3d 709, 719 (6th Cir. 2006); *cf. McBeth v. Himes*, 598 F.3d 708, 719 (10th Cir. 2010) (applying the *Hartman* framework in the context of claim based on suspension of business license in retaliation for exercise of First Amendment rights).

"best approach is to allow McCoy the opportunity to prove retaliatory arrest rather than foreclose his First Amendment claim as a matter of law." *Id.* at 561. In its application of the facts, the court determined that genuine issues of material fact existed regarding whether McCoy was arrested for his speech. *Id.* However, the court found that the officer defendants were still entitled to qualified immunity. *Id.* Under the second prong of qualified immunity, a court is to examine whether the right at issue was clearly established at the time a plaintiff was arrested. The *McCoy* court found that neither the Supreme Court nor the Fourth Circuit had recognized a First Amendment right to be free from a retaliatory arrest at the time the Plaintiff was arrested. *Id.* at 562. Therefore the court granted the officer defendants summary judgment on McCoy's § 1983 claims. *Id.*

The undersigned finds that at the time he was arrested, Husband's right to be free from a retaliatory arrest with the presence of probable cause was not clearly established. Therefore, the undersigned finds that Defendant Rainwater is entitled to qualified immunity. Accordingly, the undersigned recommends *granting* Defendants summary judgment on Plaintiffs' retaliatory arrest cause of action for Husband. However, the undersigned recommends that Wife's cause of action for a First Amendment violation survive summary judgment. As previously discussed, whether Defendant Rainwater had probable cause to arrest Wife is a question of fact. Therefore, Wife's right to be free from a retaliatory arrest was clearly established. Therefore, the undersigned recommends *denying* Defendants summary judgment based on Defendant Rainwater's alleged retaliatory arrest of Wife.

## E. Qualified Immunity

Defendants maintain that Defendant Rainwater is entitled to qualified immunity on Plaintiffs' causes of action for false arrest, excessive force, and violation of their First Amendment rights. ECF No. 42-1 at 27-33. Plaintiffs argue that Defendant Rainwater is not

entitled to qualified immunity. ECF No. 55 at 32; 35-39. Specifically, Plaintiffs maintain that "facts available to [Defendant] Rainwater at the time of [Plaintiffs'] arrest would have led an objectively reasonable officer to recognize that he did not have the requisite probable cause." *Id.* at 38. Additionally, Plaintiffs maintain that "[u]nder the totality of the circumstances, any officer should have known that he was exceeding an objectively reasonable amount of force." *Id.* at 39.

The Supreme Court in *Harlow v. Fitzgerald* established the standard that the court is to follow in determining whether a defendant is protected by this immunity. That decision held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. 800, 818 (1982). When evaluating a qualified immunity defense, the court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 230-33 (2009). The two prongs of the qualified immunity analysis may be addressed in whatever order is appropriate given the circumstances of the particular case. *Id.* at 236. In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." *Parrish v. Cleveland*, 372 F.3d 294, 301-03 (4th Cir. 2004). "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." *Id.* (citations and internal quotation omitted).

1.    Fourth Amendment Seizure Violations

As to Plaintiffs' Fourth Amendment Seizure claims, the record before the court shows that Defendant Rainwater performed a discretionary function of his respective official duty in the course of his seizure and arrest of Husband. Further, as previously addressed, the undersigned finds that Defendant Rainwater was objectively reasonable in determining that probable cause existed to arrest Husband, thus, to the extent the district judge finds that a constitutional violation occurred, the undersigned recommends that Defendant Rainwater be granted qualified immunity.

However, as also previously addressed, the undersigned finds that whether it was objectively reasonable for Defendant Rainwater to arrest Wife remains a question of fact. Further, Wife's constitutional rights were clearly established at the time Defendant Rainwater acted. Thus, to the extent the district judge finds that a constitutional violation occurred, the undersigned recommends that Defendant Rainwater not be granted qualified immunity concerning Wife's Fourth Amendment cause of action for false arrest.

2.     Fourth Amendment Excessive Force Violations

The record before the court shows that Defendant Rainwater was performing the discretionary functions of his respective official duty. However, as previously addressed, the undersigned finds that whether Defendant Rainwater performed that function using an objectively reasonable amount of force during his apprehension of Husband and attempted apprehension of Wife remains a question of fact. Further, Plaintiffs' constitutional rights were clearly established at the time Defendant Rainwater acted. Thus, to the extent the district judge finds that a constitutional violation occurred as to excessive force, the undersigned recommends that Defendant Rainwater not be granted qualified immunity.

3.     First Amendment Violations

Based on the above analysis, the undersigned finds that at the time Husband was arrested, his right to be free from a retaliatory arrest with the presence of probable cause was not clearly

established. However, Wife's right to be free from a retaliatory seizure was clearly established when Defendant Rainwater attempted to apprehend her. Therefore, the undersigned finds that Defendant Rainwater is entitled to qualified immunity on Husband's cause of action for a First Amendment violation but not Wife's. Accordingly, the undersigned recommends *granting* Defendant Rainwater summary judgment on Husband's First Amendment false arrest cause of action and *denying* Defendant Rainwater summary judgment on Wife's cause of action.

   F.   State Law Claims

Defendants argue that probable cause existed for Plaintiffs' arrests which disposes of Plaintiffs' state law claims for false arrest and false imprisonment. ECF No. 42-1 at 33. Additionally, Defendants argue that because Defendant Rainwater used an objectively reasonable amount of force to subdue Plaintiffs and acted lawfully, "they cannot form the basis for a state-law battery claim." *Id.* at 33-34. Alternatively, Defendants maintain that even if Plaintiffs set forth valid state law claims, that Defendant Sheriff of Chesterfield County would still be immune from suit for such claims because under the South Carolina Tort Claims Act ("SCTCA") "law enforcement is immune for loss resulting from the exercise of discretion." *Id.* at 34 (citing S.C. Code Ann § 15-78-60(5)). Defendants also assert that the SCTCA provides immunity for loss resulting from "the method of providing police . . . protection." *See id.* (citing S.C. Code Ann. § 15-78-60(6)). Finally, Defendants argue that the allegations against police officers arising out of their enforcement of criminal laws or following procedures are subject to immunity pursuant to section 15-78-60(4) of the South Carolina Code. *Id.* at 35. Plaintiffs argue that there are genuine issues of material fact as to whether probable cause was established and "[a]s such, summary judgment would be improper on the state law claims alleged by [Plaintiffs]." ECF No. 55 at 43. Additionally, Plaintiffs maintain that Defendants are not entitled to immunity under SCTCA. *Id.* at 46. The undersigned will address Plaintiffs' state law causes of

action individually and will conclude by determining whether SCTCA affects immunity for these causes of action.

        1.     False Arrest and False Imprisonment

The elements for the torts of false arrest and false imprisonment in South Carolina are the same. To prevail on a state law cause of action for false arrest or false imprisonment, Plaintiffs must establish: "(1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful." *Law v. South Carolina Dept. of Corrections*, 629 S.E.2d 642, 651 (S.C. 2006); *Zimbelman v. Savage*, 745 F. Supp. 2d 664, 683 (D.S.C. 2010); *Law v. S.C. Dep't of Corr.*, 629 S.E.2d 642, 651 (S.C. 2006) ("To prevail on a claim for false imprisonment, the plaintiff must establish: (1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful.").

Plaintiffs devote a large part of their Response towards addressing "whether the facts and circumstances supported that a 'freshly committed' crime had occurred," in order to support their position that probable cause did not exist. *See* ECF No. 55 at 21-24. There, Plaintiffs cite both statutory and common law. *See id.*

Under South Carolina Code section 17-13-30, "[t]he sheriffs and deputy sheriffs of this State may arrest without warrant any and all persons who, within their view, violate any of the criminal laws of this State if such arrest be made at the time of such violation of law or immediately thereafter." In *State v. Martin*, 268 S.E.2d 105, 107 (S.C. 1980), the court noted that the rule in section 17-13-30 must be interpreted in light of South Carolina Code section 23-13-60 which provides that such officers "may for any suspected freshly committed crime, whether upon view or upon prompt information or complaint, arrest without warrant. . . ." Therefore, under the *Martin* holding "an officer can arrest for a misdemeanor [not committed within his presence]

when the facts and circumstances observed by the officer give him probable cause to believe that a crime has been freshly committed." 268 S.E.2d at 107.

Here, the undersigned finds that probable cause still existed to arrest Husband even under the added South Carolina "freshly committed crime" requirement. Undisputed evidence demonstrates that Defendant Rainwater arrested Husband after Husband and a truck driver got into a verbal dispute on the day in question, after which the truck driver called 911. *See* ECF No. 55-1 at 58-71; 55-4. Furthermore, Defendant Rainwater testified that he responded to the dispatch call "immediately." ECF No. 55-5 at 10. Undisputed evidence also demonstrates that the delivery truck driver Howell was still at the scene of the alleged altercation when Defendant Rainwater arrived. ECF No. 55-6 at 1-3. Though Plaintiffs maintain that "[t]here is conflicting evidence on the amount of time that had passed between [Husband's] interactions with Mr. Howell and [Defendant] Rainwater's arrival," this argument is not enough to withstand a finding of probable cause in this instance. Therefore, Husband's false arrest and false imprisonment claims fail because he does not satisfy the "restraint was unlawful" requirement. However, the undersigned recommends that Wife's false arrest and false imprisonment claims survive summary judgment because whether her restraint was unlawful remains a question of fact. Accordingly, the undersigned recommends granting Defendant summary judgment and dismissing Husband's claims but denying Defendants summary judgment on Wife's claims.

2.     Battery

The tort of "battery" is defined as "the actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree; it is unnecessary that the contact be by a blow, as any forcible contact is sufficient." *Mellen v. Lane*, 659 S.E.2d 236, 244 (S.C. Ct. App. 2008). Based on the above excessive force analysis in section III-C, *see supra*, the

undersigned recommends Plaintiffs' battery claims survive summary judgment because whether the alleged "violence" used against them was unlawful and unauthorized remains a question of fact.

        3.      Immunity under SCTCA

Defendants maintain that Defendant Sheriff of Chesterfield County is immune from suit for the surviving state law claims under SCTCA. ECF No. 42-1 at 34. Section 15-78-60 of the South Carolina Code provides 40 exceptions to South Carolina's waiver of immunity. Defendants maintain that three subsections provide Defendant Sheriff of Chesterfield County with immunity.

First, Defendants maintain that section 15-78-60(5) provides immunity. Section 15-78-60(5) provides: "The governmental entity is not liable for loss resulting from. . . .(5) the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee." Defendants maintain that "the decision whether to arrest or detain Plaintiffs and the amount of force that was necessary under the circumstances are clearly discretionary decisions entitled to immunity." ECF No. 42-1 at 34. Further, Defendants maintain that "the fact that [Defendant] Rainwater is entitled to present a defense of qualified immunity indicates that he was engaged [in] a discretionary function." *Id.*

"To establish discretionary immunity, the governmental entity must prove its employees, faced with alternatives, actually weighed competing considerations and made a conscious choice." *Clark v. S.C. Dep't of Pub. Safety*, 608 S.E.2d 573, 578 (S.C. 2005). "The governmental entity must show that in weighing the competing considerations and alternatives, it utilized accepted professional standards appropriate to resolve the issue before them, [and] [m]ere room

for discretion on the part of the entity is not sufficient to invoke the discretionary immunity provision." *Id.* In the *Clark* case, the South Carolina Supreme Court held that "a law enforcement officer is not immune from liability under Section 15-78-60(5) for the decision on whether to begin or continue the immediate pursuit of a suspect." *Id.* at 579. Based on the *Clark* holding and the undersigned's reasoning in the qualified immunity section, *see supra*, the undersigned recommends that Defendant Sheriff of Chesterfield County not be granted immunity under SCTCA based on Defendant Rainwater's actions.

Defendants also assert that SCTCA provides immunity for loss resulting from "the method of providing police . . . protection." ECF No. 42-1 at 34-35 (citing S.C. Code Ann. § 15-78-60(6)). Defendants cite to *Huggins v. Metts*, 640 S.E.2d 465, 467 (S.C. Ct. App. 2006) in support of their position. In its entirety, the exception to waiver found in subsection six indicates that: "The governmental entity is not liable for loss resulting from. . . .(6) civil disobedience, riot, insurrection, or rebellion or the failure to provide the method of providing police or fire protection[.]" In *Huggins*, state police responded to a call stating that Charles Huggins, III, "was threatening to burn down several homes and to commit suicide." *Id.* at 465. Ultimately, police shot and killed Huggins because he was armed with two butcher knives and continued to approach police after being warned to "not come any closer or [police] will shoot." *Id.* at 466.

Huggins' estate brought suit in federal court and alleged that "[p]olice violated [Huggins'] Fourth Amendment rights on the basis that they used unreasonable force in fatally shooting [Huggins]." *Id.* A federal district court granted summary judgment in favor of the police and declined to exercise jurisdiction over the remaining state claims. *Id.* Thereafter, a South Carolina circuit court also granted summary judgment in favor of police, and the South Carolina Court of Appeals affirmed the circuit court holding section 15-78-60(6) "specifically exempts the

Police from liability concerning the methods which they choose to utilize to provide police protection." 640 S.E.2d at 467.

The undersigned finds the *Huggins* holding does not relieve any Defendant of liability in this situation. Unlike the facts in *Huggins*, here Defendant Rainwater was not responding to a call where Husband was continuing to threaten harm to the public or himself. Rather, the altercation with the truck driver was over, and Husband had returned home when Defendant Rainwater arrived at Plaintiffs' home. Moreover, the undersigned recommends denying summary judgment on several causes of action based on remaining questions of fact. Therefore, the undersigned recommends denying summary judgment to Defendant Sheriff of Chesterfield County based on section 15-78-60(6) immunity.

Finally, Defendants argue that the allegations against police officers arising out of their enforcement of criminal laws or following procedures are subject to immunity pursuant to section 15-78-60(4) of the South Carolina Code. ECF No. 42-1 at 35. Defendants cite the *McCoy* case in support of their position. 929 F. Supp. 2d at 566-67. In its entirety, the exception to waiver found in subsection four indicates:  "The governmental entity is not liable for loss resulting from. . . .(4) adoption, enforcement, or compliance with any law or failure to adopt or enforce any law, whether valid or invalid, including, but not limited to, any charter, provision, ordinance, resolution, rule, regulation, or written policies."

Section 15-78-60(4) only applies to Defendant Rainwater's enforcement of a law or ordinance when he arrested Husband. However, the undersigned found that Defendant Rainwater had probable cause to arrest Husband for either common law assault or his violation of the "Communicating Threats Statute." Consequently, the undersigned previously recommended dismissing Husband's § 1983 claims for Fourth Amendment violations and state law causes of

action for false arrest and false imprisonment. Therefore, because the undersigned recommends dismissing those causes of action it is unnecessary to address whether Defendant Sheriff of Chesterfield County is immune from liability. Furthermore, section 15-78-60(4) would not provide immunity for any remaining/surviving cause of action, it is inapplicable. Therefore, the undersigned recommends denying summary judgment to Defendant Sheriff of Chesterfield County based on section 15-78-60(4) immunity.

IV.    Conclusion and Recommendation

Based on the foregoing, it is recommended that Defendants' Motion for Summary Judgment, ECF No. 42, be *granted* in part and *denied* in part. Specifically, based on undisputed facts the undersigned recommends granting Defendants' summary judgment and dismissing Husband's § 1983 claims for Fourth Amendment violations and his state law claims for false arrest and false imprisonment. Based on disputed facts, the undersigned recommends denying Defendants summary judgment on all remaining causes of action. Additionally, based on the above analysis, the undersigned finds that the above-mentioned provisions of the SCTCA would not provide immunity for any named Defendant.

IT IS SO RECOMMENDED.

October 13, 2015                          Kaymani D. West
Florence, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**